IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

FILED

MAY 1 3 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INFORMATION** |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 1:22 CR 248 |
| ELI TAIEB, | ) | Title 18, United States Code, Section 371 |
| Defendant. | ) | |

**JUDGE NUGENT**

**MAG. JUDGE PARKER**

**The United States Attorney Charges:**

General Allegations

At all times material to this Information:

1. Defendant ELI TAIEB was a resident of Florida.

2. PotNetwork Holdings, Inc. ("PotNetwork" or "POTN"), Vapor Group, Inc. ("Vapor" or "VPOR"), CLIC Technology, Inc. ("CLCI"), White Label Liquid, Inc. ("White Label Liquid" or "WLAB"), Canna Corporation ("Canna" or "CNCC"), Grand Capital Ventures, Inc. ("Grand Capital" or "GRCV"), collectively the Manipulated Public Companies, were public companies that traded on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and financial information for certain over-the-counter securities and issuers.

3. The Manipulated Public Companies were small, closely held (i.e., owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

4. Defendant controlled a substantial number of outstanding, restricted, and free-trading shares of POTN, VPOR, CLCI, WLAB, and CNCC through his personal companies, co-conspirators, family members, and through associates over which Defendant had influence and control.

5. Defendant, Charles Vaccaro, and Dror Svorai, with the assistance of Dennis Ruggeri, Gary Berlly, Kevin Hagen, Yosef Biton (all separately charged) and others, used co-conspirators and nominees to acquire outstanding shares and purchase convertible notes in the Manipulated Public Companies.

6. Defendant and Vaccaro arranged a profit-sharing agreement on a POTN convertible note, wherein Defendant was entitled to 49% of the value of converted shares when they were sold.

7. Members of Defendant's family worked for companies controlled by Defendant and Vaccaro. The family members obtained shares by, among other ways, obtaining convertible notes, and through the issuance of preferred shares in POTN and certain of the other Manipulated Public Companies.

8. Defendant provided attorneys with incomplete information to obtain legal opinions pursuant to Title 17, Code of Federal Regulations, Section 230.144, et al., in order to satisfy legal requirements to deposit shares with registered brokerage firms and to lift stock restrictions with the transfer agents. The legal opinions contained misrepresentations concerning the relationship the customer and the issuer, the customer and an affiliate of the issuer, the consideration paid (if any), and other material misrepresentations.

9. Defendant and others provided incomplete information to transfer agents and others to facilitate the deposit and sale of securities for Defendant's and his family members' benefit.

10. Defendant, Vaccaro, Svorai, and Ruggeri and others registered and caused the registration of accounts at registered stock brokerage firms to deposit and sell shares held in their names, by entities and nominees they controlled and by co-conspirators.

11. Defendant, Vaccaro, Svorai, with the assistance of Ruggeri, used unregistered brokers—Eastmore Global Ltd., EMA Financial, Green Coast Capital, L2 Capital and Veritas Venture, among others—to liquidate and sell free trading shares of the Manipulated Public Companies by paying them undisclosed commissions for selling the shares into the stock market.

## Control of the Manipulated Public Companies

12. Defendant exercised *de facto* control of POTN; he effectively operated POTN and Distribution Wholesale, a subsidiary of POTN, and exercised control of the content and timing of press releases, and directed the payments to companies promoting the Manipulated Public Companies, such as FN Media and Awareness Consulting Network, among others.

13. The then-Chief Executive Officer of POTN, Hagen, took direction from Defendant, Vaccaro, Svorai and others for paying various items, such as, promotional campaigns from POTN and Distribution Wholesale accounts. The then-Chief Executive Officer of POTN also took direction from Defendant for paying personal expenses from POTN and Distribution Wholesale accounts.

14. Defendant was co-located with Vaccaro and Ruggeri in a set of adjoining offices in Miami, Florida. Svorai had a separate office space on the same floor, next to Defendant's suite. Defendant knew that the others had access to and planned around the timing of POTN, among other things, press releases.

15. Defendant, Vaccaro, Svorai, Ruggeri and others controlled the volume of trading by coordinating the sale of large blocks of shares timed with press releases paid by the company or entities controlled by the Defendant and his associates.

16. Through the Defendant, Vaccaro, Svorai, Ruggeri and others, had influence and control of the authorship, timing, and content of press releases issued by POTN.

17. Defendant, Vaccaro, and Svorai also directed payments for promotion of WLAB, CLCI, VPOR and GRCV to be paid directly and indirectly from nominee corporation bank accounts to conceal the identity of the individuals touting the stock.

18. During the periods when the Manipulated Public Companies' stock was being promoted and manipulated, the value of the stocks did not reflect their actual current earnings potential or business operations.

### Selling Stock Without Disclosure

19. Defendant, Vaccaro, and Svorai, with Ruggeri's assistance, were able to obtain ownership and control of millions of shares in POTN WLAB, CLCI, VPOR and GRCV at a significant discount. Those shares were sold and intended to be sold to the market without disclosing that Defendant, Vaccaro, and Svorai controlled those shares, their relationship to the public companies, or that they were controlling and paying for the promotion of those stocks to the general public.

### COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 371)

20. The allegations contained in paragraphs 1 through 19 are re-alleged and incorporated as though fully set forth herein.

21. From in or around January 2017, through on or about July 19, 2019, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendant ELI TAIEB, Vaccaro,

4

Svorai, and Ruggeri, together with others, did knowingly and intentionally combine, conspire, confederate, and agree with each other to commit offenses against the United States, specifically:

    a.    To knowingly and willfully, by the use of the means and instrumentalities of interstate commerce and of the mails, use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities by: (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made omissions of material facts that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon any persons, including members of the investing public and sellers and purchasers of PotNetwork Holdings, Inc., Vapor Group, Inc., CLIC Technology, Inc., White Label Liquid, Inc., Canna Corporation, and Grand Capital Ventures, Inc.'s securities, in violation of Title 15, United States Code, Sections 78j(b), 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Securities Fraud);

    b.    To knowingly and willfully, by the use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange, for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for any such security, by: (a) entering an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same and different parties, and (b) entering any order and orders for the sale of any such security with the

knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same and different parties, in violation of Title 15, United States Code, Sections 78i(a)(1) and 78ff (Manipulative Securities Trading).

## OBJECTS OF THE CONSPIRACY

22.  The objects of the conspiracy included, but were not limited to: (1) defrauding the investors; (2) obtaining investor monies and pay and receive undisclosed commissions; (3) inflating the value of the Manipulated Public Companies; and (4) enriching the conspirators.

## MANNER AND MEANS

23.  It was part of the conspiracy that:

24.  Defendant, Vaccaro, Svorai, Biton, and others, obtained control of public "shell" companies, and executed sales and mergers of businesses with the shells to create publicly traded companies.

25.  Defendant, Vaccaro, Svorai, and others, controlled existing debt of the publicly traded companies and indebted those companies using convertible notes they ultimately controlled, and then converted the notes into free-trading, unrestricted shares.

26.  Defendant, Vaccaro, Svorai, and others, sold those shares into the market while concealing that they, in fact, controlled the shares and the stock of the Manipulated Public Companies.

27.  Defendant, Vaccaro, Svorai, Ruggeri, and others, used manipulative stock trading techniques, such as transferring convertible notes and large blocks of shares to nominees and

other entities they controlled, to conceal their control of the stock in the Manipulated Public Companies.

28. Defendant, Vaccaro, Svorai, and others, were authorized signers on the bank accounts for nominees and other entities they controlled in order to transfer proceeds of the sale of shares of the Manipulated Public Companies and pay expenses, such as payments to promoters.

29. Defendant, Vaccaro, Svorai, Ruggeri, and others, tracked the ownership percentage of their nominees and entities they controlled to ensure that each nominee stayed below certain reporting thresholds to further conceal the true control of the Manipulated Public Companies.

30. Defendant, Vaccaro, Svorai, and others, sold, at a discount, large blocks of shares in the Manipulated Public Companies to co-conspirators who were aware the stock was manipulated in order for the co-conspirators to profit when the stocks were promoted and for the Defendants to receive payment for the shares upfront.

31. Defendant, Vaccaro, Svorai, and others, controlled and directed the issuance of board resolutions authorizing the conversion of notes into free-trading shares of the Manipulated Public Companies.

32. Defendant, and others, sought out and provided incomplete information to attorneys in order to obtain Rule 144 legal opinions containing misrepresentations to satisfy legal requirements for depositing the stock for sale.

33. Defendant, Vaccaro, Svorai, Berlly and others, deposited and attempted to deposit shares of the Manipulated Public Companies at registered brokers, and if the deposit was

rejected, Defendant and his co-conspirators sought out another broker who would accept the deposit.

34. Defendant, Vaccaro, Svorai, Hagen and others, paid stock promoters and media companies to promote the Manipulated Public Companies at the same time the Defendants and others were depositing large blocks of shares with registered and unregistered brokers.

35. Defendant, Vaccaro, Svorai, Ruggeri, and others, provided press releases from the Manipulated Public Companies to each other and to co-conspirators in advance of the press release's release date.

36. Defendant, Vaccaro, Svorai, Ruggeri, and others, caused the creation and release of favorable press releases and other information to promote the Manipulated Public Companies.

37. Defendant, Vaccaro, Svorai, and others, paid undisclosed commissions to co-conspirators who helped facilitate the sale of shares of the Manipulated Public Companies.

38. Defendant, Vaccaro, Svorai, and others, paid undisclosed commissions to co-conspirators for the repatriation of proceeds of sales of shares of the Manipulated Public Companies sold outside the United States.

39. Defendant, Vaccaro, Svorai, and others, divided up the proceeds from the sale of shares of the Manipulated Public Companies in accordance with their respective interests in shares sold.

40. Svorai made threats to kidnap and kill co-conspirators who did not pay him money he believed he was owed and falsely stated that Defendant was threatening to sell his debt to MS-13 and intimated that MS-13 would kill everyone involved to collect the debt.

41. Defendant, Vaccaro, Svorai, Ruggeri, Berlly, Hagen, Biton and others, communicated with co-conspirators and others using interstate wires, including e-mail, and

encrypted messaging apps, to discuss manipulative stock trading techniques, payments made and money owed.

42. Svorai, and others transmitted, and caused the transmission of, interstate wires in the form of falsified invoices for services to receive monies representing the proceeds of sales of shares of the Manipulated Public Companies.

43. Hagen, Biton, and others, filed reports with the SEC. Those reports contained certain statements that were false regarding the true beneficial owners of stock in the Manipulated Public Companies, the amount of compensation received by corporate officers, and who truly controlled the Manipulated Public Companies, among other misrepresentations.

OVERT ACTS

44. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others performed the following overt acts, among others, in the Northern District of Ohio, Eastern Division, and elsewhere:

45. Beginning in and around May 2017 through in and around December 2017, Defendant worked with Vaccaro and a promoter to increase the price and volume of POTN by providing the promoter with advance press releases and at least approximately $225,000 as payment for promoting and selling the stock.

46. From in and around September 18, 2018 through in and around October 15, 2018, Defendant, Ruggeri and others caused unregistered broker, Eastmore Global Ltd, to deposit approximately $750,660 into an account in the name of one of Defendant's family members. The money represented the consideration for the sale of discounted POTN shares to the unregistered broker. Defendant later transferred approximately $540,000 from the family member's account into his personal account.

47. Between on or about November 16, 2018, through on or about January 16, 2019, Defendant, Ruggeri, and others caused unregistered broker, EMA Financial LLC, to deposit approximately $1,639,830 into a bank account in the name of one of Defendant's family members. The money paid to Defendant for the sale of discount POTN shares was held in Defendant's family member's name. During that same period, Defendant transferred approximately $1,650,000 from the family member's account into his own personal account.

48. Between on or about February 14, 2019, through on or about February 21, 2019, Defendant and others caused the opening of a bank account at JP Morgan Chase held in a family member's company's name. Defendant added himself as an authorized signer on that account and caused unregistered broker, EMA Financial LLC, to deposit approximately $633,780 into the account. The money was payment for the sale of discount POTN shares held in Defendant's family member's name. The day after the deposit, Defendant transferred approximately $600,000 from the company's account into an account he controlled.

49. Between on or about April 3, 2019 and through on or about April 6, 2019, Defendant, Svorai and "Naples" had the following conversation on WhatsApp:

> Naples: Good evening Eli and Dror. I urgently need money who is paying me the 30k that past due??
>
> Naples: I thought I am suppose to receive the 10k monthly payments from you and you will deal with Dror later
>
> SVORAI: We have an issue Yaniv . . .without PR, we can't sell shares it will take 3 months to get 50k and you not the only one that needs to get paid . . we were supposed to have $160k in PR y now and we have 0 . . so I'm not sure how to help you
>
> Naples: My money wasn't depended on your deal with each other. I agreed to the deal based on the fact that I am getting the 60k quickly and I planned on that money.

50. Between in and around April 2019 through in and around July 2019, Defendant, Vaccaro, Svorai, Ruggeri and others, agreed and worked together to sell shares of POTN, VPOR,

10

WLAB, MPGR, and CLCI through an offshore broker and an individual who agreed to repatriate the proceeds back to the Defendant and others in exchange for a fee. During this time period, Defendant was aware that Svorai was selling and preparing to sell VPOR, MPGR, and GRCV shares through the offshore broker. Defendant was aware that he and Vaccaro were selling and preparing to sell POTN, CLCI, and WLAB shares through the offshore broker. Defendant was aware that an individual in the United States was helping to bring the proceeds of those sales back into the United States and transferring them to the Defendant, Vaccaro, and Svorai. Defendant agreed with Vaccaro and Svorai to obtain Ruggeri's advice regarding transfer of the shares to the offshore broker for sale, including preparation of documents necessary to effect that transfer. Defendant, Vaccaro and Svorai agreed to split proceeds of the offshore sales.

51. On or about July 12, 2019, Defendant received a message from Vaccaro wherein Vaccaro threatened to kidnap and beat a co-conspirator whom Vaccaro believed was not paying Defendant, Vaccaro, and Svorai the money owed from the offshore sales.

52. From on or about June 24, 2019 until on or about July 19, 2019, Defendant was aware that Svorai arranged to enter into a fraudulent consulting agreement to provide "cover" for the receipt of proceeds of offshore stock sales. Defendant knew and agreed that the money received through this scheme would be split between Svorai, Vaccaro and Defendant.

In violation of Title 18, United States Code, Section 371.

## FORFEITURE

53. The allegations of Count 1 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c). As a result of the foregoing offense, Defendant ELI TAIEB shall forfeit to the United States all property, real and personal,

which constitutes - or is derived from - proceeds traceable to the commission of such offense; including, but not limited to, the following:

    a.     Richard Mille man's watch (valued at approximately $139,000.00) seized on or about July 22, 2019, from ELI TAIEB. The watch is described as follows: Richard Mille watch model RM11-03 RG/TI, serial number: 1417.

    b.     Richard Mille watch model RM11-01 RG/TI, serial number: 489. ELI TAIEB purchased this watch on or around November 2018, from the Richard Mille Boutique for $158,500.00.

    c.     2017 Tesla Model X, VIN: 5YJXCAE26HF055328. ELI TAIEB purchased the vehicle on or around July 2017, from Tesla Motors Inc for $131,859.83. Upon its purchase, the vehicle was titled to ELI TAIEB. There are no liens attached to the vehicle.

    d.     2014 Bentley Continental Convertible, VIN: SCBGH3ZAXEC040244. ELI TAIEB purchased this vehicle on or around August 2017, from Jumbo Luxury Cars for $149,935.00. Upon its purchase, the vehicle was titled to Defendant's spouse. There are no liens attached to the vehicle.

    e.     $7,981.00 U.S. Currency seized on or about July 22, 2019, at a location on West Dixie Highway in Miami, Florida.

    f.     18555 Collins Avenue, Condominium Unit: 4701, Sunny Isles Beach, Miami-Dade County, Florida, Tax ID #: 31-2202-050-0380.

    g.     3329 Bradenham Lane, Davie, Broward County, Florida, Parcel ID Number: 504119-14-0270.

KENNETH L. PARKER
United States Attorney
Southern District of Ohio
Acting Under Authority Conferred by
28 U.S.C. § 515

By: _____
ALEJANDRO A. ABREU
Assistant United States Attorney

13